**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| MAURICE CHARLESTON, | : | CIVIL ACTION NO. |
| GDC ID # 901565, Case # 575856, | : | 1:15-CV-01960-TWT-JSA |
|    Petitioner, | : | |
| | : | |
|    v. | : | |
| | : | |
| AHMED HOLT, | : | HABEAS CORPUS |
|    Respondent. | : | 28 U.S.C. § 2254 |

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION

Petitioner, a Georgia prisoner, challenges via a 28 U.S.C. § 2254 habeas corpus petition his April 8, 2005 convictions in the Superior Court of Fulton County.  (Doc. 1).  **IT IS RECOMMENDED** that the petition be **DENIED**.

I.    **Procedural History**

   A.    **Jury Trial & Direct Appeal**

Petitioner and his co-defendant, Scott Walker, were indicted in Fulton County, Georgia on June 20, 2003 for malice murder, felony murder, burglary, aggravated assault and possession of a firearm during a crime committed on April 4, 2003.  *Charleston v. State*, 743 S.E.2d 1, 2 n.1 (Ga. 2013).  In April 2005, Petitioner and Walker were convicted on all counts, and Petitioner received a life sentence for malice murder and a consecutive term of five years for the firearm conviction.  *Id.*

Viewed in the light most favorable to the verdict, the evidence presented at trial showed the following. *See Walker v. State*, 653 S.E.2d 468, 469-70 (Ga. 2007) (affirming co-defendant's convictions). On the evening of April 4, 2003, Edric Finney ran a quick errand for his girlfriend, Pamela Lyman, and then returned to her apartment, which at the time was his primary residence. Just before Finney entered, Lyman heard him at her door exchanging obscenities with another person. She then heard a single gunshot. When she went into the living room, she found her door wide open and Finney lying on the floor with a gunshot wound to the head.

Two off-duty police officers who were working as security officers at the apartment complex had heard a loud pop like the sound of a firecracker. They approached Lyman's apartment and saw two young men running from the apartment in different directions. At the apartment, the officers found Lyman crouched against the wall screaming and Finney lying in a pool of blood. Finney died of a single close-range shotgun blast to the head.

[Petitioner] and Walker had stopped by a friend's apartment shortly before the shooting. They were riding in a gray minivan that belonged to [Petitioner's] grandmother, and when they left, [Petitioner] told his friend that he was taking Walker home. Shortly thereafter, however, the friend went to visit someone at the nearby apartment complex where the crimes occurred and saw the minivan parked near Lyman's apartment. The police were already there investigating the shooting. According to the friend, Walker had referred to himself and [Petitioner] as "brothers."

At trial, Lyman testified that she recognized [Petitioner] and Walker because both men had been to her apartment in the days before Finney's murder. Walker came to her apartment and asked her for a gun, which he claimed was in Finney's possession but belonged to "his brother," who would need it when he was released from jail. The next night, which Lyman testified was the night [Petitioner] got out of jail, [Petitioner] came to her apartment driving a grey minivan. He told Lyman that if Finney wanted to keep his gun, Finney should bring some money by his

2

house. On the day of the shooting, Walker came to Lyman's apartment again to ask her about the gun and Finney's whereabouts. Finney, who overheard the conversation from inside the apartment, emerged to talk to Walker, spoke with Walker for 15-20 minutes out of Lyman's earshot, and then returned to the apartment. Lyman also testified that Finney had been hiding a gun under the mattress in her bedroom.

Around the time of the shooting, Cheryl Sewell, a neighbor of Lyman, saw Finney stop to talk to two men, whom she identified at trial as [Petitioner] and Walker, on the sidewalk outside the apartment building. Sewell saw Finney enter Lyman's apartment, followed shortly thereafter by the two men, who opened the door without knocking. Walker had a weapon. Sewell heard someone say "oh," followed by a single gunshot and the sound of something falling. Sewell then saw the two men emerge from the apartment, heading in different directions. Before trial, Sewell had identified Walker in one photographic lineup, although she was only able to narrow a second lineup down to three possible suspects, one of whom was [Petitioner].

Kahiem Maddox, another neighbor, identified [Petitioner] and Walker from photographic lineups as the men he saw outside Lyman's apartment on the night of the crimes. Maddox, who was incarcerated at the time of trial, testified reluctantly and had to be impeached with his prior statement.

[Petitioner] and Walker were arrested at [Petitioner's] father's house a few hours after the shooting. When police officers arrived, [Petitioner] answered the door but would not let them in. His father, however, did let them in, and they found Walker hiding under some mattresses.

*Id.* at 3-4 (citation altered).

Petitioner raised the following claims on direct appeal:

1.   the State failed to put Jonathan Finney, the victim's brother, on its

witness list, as required by OCGA § 17-16-3, and [] the trial court erred
in not granting [Petitioner] a continuance before Jonathan testified;

2.    the trial court erred in denying [Petitioner's] motion to sever his trial from
Walker's trial;

3.    trial counsel was ineffective in failing to object to Jonathan Finney's
testimony on the ground that the State failed to put him on its witness list
as required by OCGA § 17-16-3;

4.    trial counsel was ineffective in failing to object when Lyman twice
referred in passing to [Petitioner] being in prison, which, he alleges,
improperly placed his character in issue;

5.    trial counsel was ineffective in failing to move to suppress evidence
found during the search of [Petitioner's] father's home;

6.    [after Walker said during the sentencing hearing that Petitioner] "did not
do it. I did it. He didn't know nothing were going to go down like that[,]"
. . . the trial court erred in failing to grant [Petitioner's] motion for new
trial based on this allegedly "newly discovered evidence";

7.    the evidence was insufficient to support Petitioner's convictions.

*Id.* at 4-6; (*see* Doc. 13-7 at 98-99).  On March 25, 2013, the Supreme Court of

Georgia denied each of these claims and affirmed Petitioner's convictions and

sentences.  *Charleston*, 743 S.E.2d at 4-6.

###    B.    State Habeas Petition

In his original state habeas petition, filed on February 18, 2014 (Doc. 13-1 at 1),

Petitioner alleged that appellate counsel provided ineffective assistance

4

1.    when litigating his amended motion for new trial on the ground of . . . newly discovered evidence;

and that appellate counsel also provided ineffective assistance by failing to raise the

following claims in Petitioner's amended motion for new trial:

2.    the trial court failed to act as an impartial judicial sovereign when it prevented the Petitioner from obtaining and submitting newly discovered evidence that would negate his guilt of the offenses for which he was convicted;

3.    trial counsel rendered ineffective assistance when she failed to file a pre-trial motion to suppress unreliable identification testimony of Cheryll Sewell (State's key witness) and prevent in-court identification following an impermissibly suggestive pre-trial photo line-up identification procedure conducted by police;

4.    trial counsel rendered ineffective assistance when she failed to move for a mistrial based on State's violation of due process;[1]

5.    trial counsel rendered ineffective assistance when she failed to object to State's improper closing arguments that compromised the fundamental

---

[1]The state habeas court noted that Petitioner alleged the following due process violations by the State:

(a) withholding information that the Atlanta Police Department had used an impermissibly suggestive procedure to conduct Cheryl Sewell's pre-trial photo lineup identification; (b) acting in bad faith by admitting tainted identification evidence into Petitioner's trial; and (c) failing to correct false and misleading testimony of Detective Lynn Daniel regarding the pre-trial identification of Cheryl Sewell.

(Doc. 13-4 at 7).

5

fairness of trial;[2]

6.   trial counsel rendered ineffective assistance when she failed to make a
     timely objection on the ground that the State improperly admitted hearsay
     motive evidence that compromised the fundamental fairness of trial.

(*Id.* at 10-14).

In state habeas ground 7, which Petitioner raised in his first amended state

habeas petition, he alleged that "he is actually innocent" of his crimes of conviction.[3]

---

[2]The state habeas court noted that Petitioner alleged that trial counsel failed to object
on the following grounds:

> (a) the State improperly vouched for the unreliable identification testimony
> of Cheryl Sewell, which was produced by an impermissibly suggestive
> photographic lineup procedure; (b) the State bolstered the testimony of
> Sewell; and (c) the State argued that jurors should find Petitioner guilty on
> matters not in evidence.

(Doc. 13-4 at 7).

[3]The state habeas court described the various elements of this ground:

> In support of his "actual innocence" claim, Petitioner contends that
> (a) appellate counsel failed to represent him as counsel as guaranteed by the
> Sixth Amendment at the motion for new trial hearing in regards to newly
> discovered evidence as raised in ground 1; (b) he was denied his due process
> rights to a fair trial and sentencing before an impartial judge when he was
> denied newly discovered evidence as raised in ground 2; (c) he was denied his
> due process rights to a fair trial when he was prevented from asserting his
> innocence at trial free from evidence tainted by police misconduct as raised
> in ground 4; (d) he was denied his due process rights when the State
> improperly vouched for its key witness, bolstered that witness' testimony, and
> injected matters not in evidence; and (e) the evidence presented at trial was
> not constitutionally sufficient to support his convictions.

AO 72A
(Rev.8/82)

(Doc. 13-2 at 23).  In state habeas ground 8, which Petitioner raised in his second amended state habeas petition, he alleged that appellate counsel "abandoned ground six of [his] amended motion for new trial on direct appeal in violation of due process." (Doc. 13-3 at 2).  The state habeas court noted that motion-for-new-trial ground six alleged "trial counsel ineffectiveness for not objecting to the prosecutor's closing argument that contained improper vouching for prosecution witnesses." (Doc. 13-4 at 8).

In an order entered on November 7, 2014, the state habeas court denied all of Petitioner's grounds for relief.  (Doc. 13-4).  On May 11, 2015, the Supreme Court of Georgia denied Petitioner's application for a certificate of probable cause ("CPC") to appeal the denial of his state habeas petition.  (Doc. 13-5).

### C.    Federal Habeas Petition

Petitioner signed and filed his original federal habeas petition on May 28, 2015 (Doc. 1 at 9), stating that he wishes to raise grounds 1 through 7, as set forth on attached page 2, which are the claims he raised on direct appeal (*id.* at 5, 11). Petitioner signed and filed an amended federal habeas petition on October 26, 2015, raising six additional grounds — five alleging ineffective assistance of appellate

---

(Doc. 13-4 at 17).

counsel and one asserting his actual innocence.  (Doc. 12).  He filed a second amended habeas petition (hereinafter "supporting brief") on December 15, 2015.  (Doc. 16).

## II.   Federal Habeas Review

### A.   Merits Review

A federal court may not grant habeas corpus relief for claims previously decided on the merits by a state court unless the decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  A state court's determination of a factual issue is presumed correct unless the petitioner rebuts that presumption "by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

In *Williams v. Taylor*, 529 U.S. 362, 412 (2000), the Supreme Court explained that, in applying 28 U.S.C. § 2254(d), a federal habeas court first ascertains the "clearly established Federal law" based on "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." The federal habeas court then considers whether the state court decision is "contrary to" that clearly established federal law, i.e., whether the state court "applies a rule that

8

contradicts the governing law set forth" in Supreme Court cases, or "confronts a set of facts that are materially indistinguishable from" those in a Supreme Court decision "and nevertheless arrives at a result different from" that decision. *Id.* at 405-06.

If the federal habeas court determines that the state court decision is not contrary to clearly established federal law, it then considers whether the decision is an "unreasonable application" of that law, i.e., whether "the state court identifies the correct governing legal principle" from the Supreme Court's decisions, "but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (internal quotations omitted). "Under § 2254(d)(1)'s 'unreasonable application' clause . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly [but r]ather, that application must also be unreasonable." *Williams*, 529 U.S. at 411. "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was *an error well understood and comprehended in existing law*

9

*beyond any possibility for fairminded disagreement.*"   *Richter*, 562 U.S. at 103 (emphasis added).

### B.      Review of Claims of Ineffective Assistance of Counsel

The Supreme Court set forth the standard for evaluating claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984).   "An ineffectiveness claim . . . is an attack on the fundamental fairness of the proceeding whose result is challenged." *Id.* at 697.   The analysis involves two components, but a court need not address both if the petitioner "makes an insufficient showing on one." *Id.*   First, a federal habeas court determines "whether, in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance."   *Id.* at 690.   The court "must be highly deferential" in scrutinizing counsel's performance and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.   In other words, the petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."   *Id.*   (Internal quotations omitted).   "Given the strong presumption in favor of competence, the petitioner's burden of persuasion—though the presumption is not insurmountable—is a heavy one." *Chandler v. United States*,

10

218 F.3d 1305, 1314 (11th Cir. 2000) (en banc).

Second, a federal habeas court determines whether counsel's challenged acts or omissions prejudiced the petitioner, i.e., whether "there is a reasonable probability"—one "sufficient to undermine confidence in the outcome"—that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112 (noting that "the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case" (internal quotations omitted)).

"Surmounting *Strickland*'s high bar is never an easy task. . . . Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. . . . The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Id.* at 105 (citations and internal quotations omitted).

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. . . . Federal habeas courts must guard against the danger of equating unreasonableness under

11

> *Strickland* with unreasonableness under § 2254(d). When § 2254(d)
> applies, the question is not whether counsel's actions were reasonable.
> *The question is whether there is any reasonable argument that counsel*
> *satisfied Strickland's deferential standard.*

*Id.* (citations and internal quotations omitted) (emphasis added).

## III.   All of Petitioner's Federal Habeas Grounds Fail

### A.   Ground One:  Prosecutorial Misconduct – Testimony of Victim's Brother

In ground one of his federal habeas petition, Petitioner alleges: "The State acted improperly when [it] elicited the testimony of the victim's brother without properly informing the defense or giving [it] an opportunity to investigate both the witness and his testimony."  (Doc. 1 at 11; *see* Doc. 13-7 at 103 (Petitioner's direct appeal brief)). Petitioner argued on direct appeal: "It was error to allow the State to suppress exculpatory evidence from the Defense.  That is, the state acted improperly when [it] elicited the testimony of Jonathan Finney, the victim's brother, without properly informing the defense or giving [it] an opportunity to investigate both the witness and his testimony."  (Doc. 13-7 at 103).  The Supreme Court of Georgia construed Petitioner's claim as alleging that "the State failed to put Jonathan Finney, the victim's brother, on its witness list, as required by OCGA § 17-16-3, and [] the trial court erred in not granting him a continuance before Jonathan testified."  *Charleston*, 743 S.E.2d

12

at 4.  The court concluded that Petitioner "failed to raise this discovery objection or move for a continuance in the trial court, and he is therefore barred from raising the issue on appeal." *Id.*  The court also addressed the merits of the claim:

> To the extent [Petitioner] contends that the State violated his right to due process by failing to disclose to the defense before trial the substance of Jonathan's statement, *see Brady v. Maryland*, 373 U. S. 83 (1963), the claim has no merit. Walker raised the same issue in his appeal, and we held that "there was no *Brady* violation," explaining that
>
>> Jonathan Finney's suspicions regarding [the] possible involvement [of the victim's girlfriend, Lyman] were nothing more than uncorroborated speculation that, even if true, would have done little to rebut or mitigate Walker's guilt. Furthermore, the evidence in question was available to Walker at trial, at which he had the opportunity to pursue the issue through further questioning of Jonathan Finney[,] and [he] could [have], had he deemed it necessary, [] sought a continuance to further investigate this theory.
>
> This holding applies equally to [Petitioner's] claim.

*Id.* (footnote and citation omitted).  The court noted:

> Jonathan Finney testified at trial, and told the police before trial, that on the day before the shooting, he was with his brother Edric at their mother's home when Pamela Lyman telephoned Edric. According to Jonathan, Lyman told Edric that "some boys came by in a gray minivan . . . saying they're going to kill you. Baby, please come home." Because Lyman asked Edric to come home even though he had been threatened, Jonathan thought that Lyman might have had something to do with what happened to Edric. Jonathan added, however, that he never thought Lyman was the shooter. Before Jonathan testified, Appellant and Walker

13

cross-examined Lyman on this point, and she acknowledged that Jonathan was upset with her because he thought she had something to do with Edric's shooting, but she denied any involvement in the crimes.

*Id.* at 4 n.2.

Petitioner argues here, in his supporting brief, apparently for the first time:

The State asserted the Petitioner and his co-defendant shared common criminal intent to kill the victim because the victim refused to return a .45 cal[iber] Ruger pistol that belonged to the Petitioner. The Petitioner's defense team knew of the State's motive theory but was blindsided when the State called the victim's brother, Jonathan Finney, to give testimony regarding a .45 caliber Ruger pistol, which the State argued to be relevant motive evidence.

The State sought to use Jonathan's testimony as a link to connect the Petitioner to the .45 Ruger pistol and establish a basis for its motive theory; however, the State withheld vital facts contained in Jonathan's statement to police that disproved the motive theory altogether. Specifically, the State was aware of Jonathan's statement to Atlanta Police on April 7, 2003, in which he recounted his conversation with the victim the day before the victim was killed, regarding the victim's relationship with the Petitioner and the .45 Ruger pistol.

(Doc. 16 at 3). The conversation to which Petitioner refers allegedly occurred on April 3, 2003, one day before the shooting. In it, the victim, Edric Finney, allegedly told Jonathan Finney, his brother, that someone named Red had given Edric the pistol and had said that Edric "could keep the pistol because Edric had [done Red] a favor by keeping him and his girlfriend from going to jail." (*Id.* at 4).

14

But the evidence summarized by the Supreme Court of Georgia to support Petitioner's guilty verdicts contradicts Petitioner's argument here, showing instead that he and Walker had confronted Lyman, the victim's girlfriend, about a firearm belonging to Petitioner on more than one occasion "in the days before [the] murder." *See Charleston*, 743 S.E.2d at 3-4 (concluding, without mentioning Jonathan Finny or his testimony, that there was sufficient evidence to convict Petitioner, and noting: "On the day of the shooting, Walker came to Lyman's apartment again to ask her about the gun and Finney's whereabouts. Finney, who overheard the conversation from inside the apartment, emerged to talk to Walker, spoke with Walker for 15-20 minutes out of Lyman's earshot, and then returned to the apartment. Lyman also testified that Finney had been hiding a gun under the mattress in her bedroom.").[4]

Petitioner's ground one claim thus fails because he has not "show[n] that the

_____

[4]Petitioner attaches to his supporting brief a statement that Jonathan Finney gave to the police on April 7, 2003, the same day Jonathan turned over to the police the Ruger pistol he had recovered from Lyman's apartment. (Doc. 16 at 27). The statement recounts that Edric had told Jonathan that Edric's friend, Red, had given Edric the Ruger "that same day," i.e., the day before the shooting, because Edric had helped to keep Red and his baby's mother out of jail. (*Id.*). At trial, Jonathan testified that he had once met Petitioner, whom he knew as Red, when Petitioner and Edric were "kicking it," and it was "very, very mellow." (Doc. 13-13 at 43-44). But Petitioner has offered no explanation for why both he and Walker came to Lyman's apartment, where Edric often stayed, in the days leading up to the murder, inquiring about a handgun that Edric had in his possession, but that belonged to Petitioner, and demanding either payment for it or its return. *See Charleston*, 743 S.E.2d at 3.

15

[Supreme Court of Georgia's] ruling on . . . [the merits of the claim] was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *See Richter*, 562 U.S. at 103. Moreover, not only was Petitioner's ground one claim in state court couched solely in terms of state — not federal — law, but he also did not mention in his direct appeal brief the aspect of the claim that he elaborates here. Indeed, Respondent argues that Petitioner's federal habeas ground one claim is procedurally defaulted not only for this reason but also because, as the Supreme Court of Georgia held before addressing the merits of the claim, Petitioner did not preserve for appellate review the error alleged in ground one. (*See* Doc. 11-1 at 10-14). The outcome here is thus over-determined — but however one views Petitioner's ground one claim, it fails.

## B.     Ground Two: Ineffective Assistance of Counsel – Testimony of Victim's Brother

In ground two, Petitioner claims: "Trial counsel was ineffective in failing to object to the testimony of the victim's brother. The defense was not properly informed or given an opportunity to investigate both the witness and his testimony." (Doc. 1 at 11; *see* Doc. 13-7 at 104). Petitioner argued on direct appeal:

> A simple reading of the transcript leads one to make the reasonable conclusion that the Trial counsel failed to act as an advocate on several

16

> occasions. Obviously, Trial counsel's failure to object to the surprise testimony of Jonathan Finney. In doing so [Petitioner] was constructively denied assistance of counsel. Simply, trial counsel failed to subject the prosecution's case to meaningful adversarial testing.

(Doc. 13-7 at 105-06).  The Supreme Court of Georgia construed this claim as alleging that Petitioner's "trial counsel was ineffective in failing to object to Jonathan Finney's testimony on the ground that the State failed to put him on its witness list as required by OCGA § 17-16-3."  *Charleston*, 743 S.E.2d at 5.  The court rejected the claim:

> If trial counsel had objected to Jonathan's testimony based on the discovery violation, counsel could have sought a continuance to interview Jonathan before he testified or could have moved to exclude his testimony from trial if [Petitioner] could show both prejudice to the defense and bad faith by the State. *See* OCGA § 17-16-6; *Higuera-Hernandez v. State*, 289 Ga. 553, 557-558 (714 SE2d 236) (2011). [But Petitioner] offered no evidence at the motion for new trial hearing to show how he could have benefitted from a continuance or that the State acted in bad faith in leaving Jonathan off its witness list. Thus, [Petitioner] failed to show that, even if his counsel had objected to the discovery violation at trial, there is a reasonable probability that the outcome of the trial would have been different.

*Id.* (citation omitted).

Petitioner argues here, in his supporting brief:

Evidence of what the victim told Jonathan personally on April 3, 2003, may have convinced the jury that 1) the victim and the Petitioner were on friendly terms the day before the victim was killed 2) the Petitioner let the victim have the .45 Ruger pistol and was not trying to get it back from the victim 3) there was no nexus between the .45 Ruger pistol and the death

17

of the victim, and 4) [] the State's motive theory was no more than misappropriated facts which only served to prejudice the Petitioner at trial.

(Doc. 16 at 5).

Petitioner failed to show in state court that he was prejudiced by trial counsel's allegedly deficient performance.  He has offered only speculation to that effect in his supporting brief here.  The Supreme Court of Georgia found his ground two claim to be lacking in merit, and this Court finds no error in the court's analysis that is "well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *Richter*, 562 U.S. at 103, especially in light of the Supreme Court of the United States's admonition that a claim of ineffective assistance of counsel fails if there is "*any* reasonable argument that counsel satisfied *Strickland*'s deferential standard," *id.* at 105 (emphasis added).

Finney's testimony was generally limited to the circumstances of his recovery of the Ruger pistol from Lyman's apartment and his later delivery of it to the police, although he also testified about his familiarity with the defendants — other than the one incident noted above, in footnote 4, he had none — and about his belief that Lyman may have been involved in the murder, although not as the shooter, based on her telephone call to Edric the night before the murder, during which Jonathan

18

overheard her asking Edric to "please come home" because there were "some boys . . . coming by [the apartment] saying they're going to kill you." (*See* Doc. 13-13 at 51-52, 53; *see generally id.* at 38-54). But Lyman also testified about the Ruger and its eventual delivery to the police, and about Jonathan's suspicions (*see* Doc. 13-12 at 131-62; Doc. 13-13 at 1-36), and this Court therefore struggles to discern how Petitioner's defense was prejudiced by Jonathan's testimony. Indeed, because Jonathan testified about a friendly relationship between Petitioner and the victim on the one occasion when he saw them together, his testimony, if it had any impact at the trial, may actually have *helped* Petitioner's defense. Ground two fails.

## C. Ground Three: Ineffective Assistance of Counsel – Prejudicial Character Testimony

In ground three, Petitioner alleges: "Trial counsel was ineffective in failing to object to repeated references to [Petitioner] being in prison." (Doc. 1 at 11; *see* Doc. 13-7 at 106). The Supreme Court of Georgia construed this claim as alleging that Petitioner's "trial counsel was ineffective in failing to object when Lyman twice referred in passing to [Petitioner] being in prison, which, he alleges, improperly placed his character in issue." *Charleston*, 743 S.E.2d at 5. The court rejected this claim:

> [T]he record shows that while trial counsel did not make contemporaneous objections to the prison references, counsel did object

19

after Lyman's direct examination and the trial court then ruled against [Petitioner] on the merits of the objection. Moreover, we rejected co-defendant Walker's similar claim that the references to [Petitioner] being in prison improperly placed [Petitioner's] character in issue, thereby also tainting Walker's character, holding that Lyman's non-responsive answers referring in passing to [Petitioner] being incarcerated did not improperly place his character in issue.

And even if [Petitioner's] character had been improperly put at issue, where " 'trial counsel does not testify at the motion for new trial hearing, it is extremely difficult to overcome th[e] presumption' that counsel's conduct resulted from reasonable trial strategy." *Brown v. State*, 288 Ga. 902, 908 (708 SE2d 294) (2011) (citation and punctuation omitted). Because "the decision of whether to object when a defendant's character is placed in issue is (generally) a matter of trial tactics," and because [Petitioner] did not call trial counsel to testify at the motion for new trial hearing, he has not shown that counsel's decision was "an unreasonable tactical decision no competent attorney would have made under the same circumstances." *Green v. State*, 291 Ga. 287, 296 (728 SE2d 668) (2012) (citations and punctuation omitted).

*Id.* at 5-6. Aside from recounting Lyman's testimony, Petitioner has failed to offer any argument here in support of this claim, and thus he has failed show any error in the Supreme Court of Georgia's rejection of it. (*See* Doc. 16 at 6). That court found Petitioner's ground three claim to be lacking in merit, and this Court discerns no error in its analysis that is "well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *Richter*, 562 U.S. at 103, especially in light of the Supreme Court of the United States's admonition that a claim of ineffective

20

assistance of counsel fails if there is "*any* reasonable argument that counsel satisfied *Strickland*'s deferential standard," *id.* at 105 (emphasis added); *see Williams v. Head*, 185 F.3d 1223, 1228 (11th Cir. 1999) ("[W]here the record is incomplete or unclear about [trial counsel's] actions, [the court] will presume that he did what he should have done, and that he exercised reasonable professional judgment."). Because there is no evidence as to why trial counsel failed to make a contemporaneous objection to Lyman's passing references to Petitioner's being in jail just prior to the murder, the Court must presume, as did the Supreme Court of Georgia, that trial counsel exercised reasonable professional judgment in foregoing any such objection — for example, so as not to emphasize Lyman's testimony to the jury. Ground three fails.

**D.    Ground Four:  Ineffective Assistance of Counsel – Search Warrant**

In his fourth ground for relief, Petitioner alleges: "Trial counsel was ineffective in failing to file a motion to suppress illegally obtained evidence." (Doc. 1 at 11; *see* Doc. 13-7 at 107).   On direct appeal, Petitioner argued: "The search warrant responsible for this evidence was based on an affidavit containing false statements. [T]he affidavit said that an eyewitness to this event positively identified two suspects. The only two witnesses were Ms. Lyman and Ms. Sewell[,]" but neither could positively identify Petitioner as one of the suspects. (Doc. 13-7 at 107-08). The

21

Supreme Court of Georgia construed this claim as alleging that "trial counsel was ineffective in failing to move to suppress evidence found during the search of [Petitioner's] father's home." *Charleston*, 743 S.E.2d at 6. The court rejected this claim:

> [W]hen a search warrant affidavit contains incorrect information, if that information is set aside and the affidavit still contains sufficient facts to establish probable cause, the search conducted pursuant to the warrant is lawful. *See State v. Palmer*, 285 Ga. 75, 78 (673 SE2d 237) (2009). Here, even if we disregard the allegedly incorrect statement about [Petitioner] being positively identified, the affidavit accurately stated that an eyewitness had positively identified Walker as a murder suspect and that he was apprehended in the residence the State desired to search. Based on this information alone, probable cause existed to issue the search warrant. Trial counsel's decision not to pursue a meritless motion cannot serve as the basis for an ineffective assistance of counsel claim. *See Leonard v. State*, 292 Ga. 214, 217-218 (735 SE2d 767) (2012).

*Id.*

Petitioner argues here, in his supporting brief:

Atlanta Police obtained a search warrant that was based on an affidavit that falsely stated an eyewitness positively identified the Petitioner as one of the suspects and that a second witness who knew the Petitioner by name and sight led Atlanta Police to the location where she knew the suspects to be staying. (Resp. Ex. 7 (e), pg. 1189-1190). The identity of the witnesses were not revealed by the affiant (Detective M. Cooper) to the issuing magistrate. The lack of information concerning the witness[es]' veracity and basis of knowledge relegated the information supplied to the status of rumor.

22

(Doc. 16 at 6).  Once again, Petitioner has failed to cast doubt on the correctness of the Supreme Court of Georgia's denial of this ground for relief.  For the same reasons as for grounds two and three, also alleging ineffective assistance of trial counsel, this ground four claim fails.[5]

### E.    Ground Five:  Trial Court Error – Severance

In ground five, Petitioner contends: "The trial court erred in denying [his] motion for severance."  (Doc. 1 at 11; *see* Doc. 13-7 at 108).  On direct appeal, Petitioner argued:

> There are several examples of the facts or evidence against one Defendant bleeding into those of the co-defendant. An example is the testimony of Ms. Sewell. She testified that she saw Mr. Walker and another individual running from the apartment (T. 537). While she said she didn't know who the other person was and could not pick {Petitioner] out of the police photo array (T. 540), she was able to pick him out as he sat next to Mr. Walker at trial. If [her] memory [was] better closer in time to the incident, Ms. Sewell's testimony [was] either bolstered by practice with the prosecutor or she used the process of elimination to pick out [Petitioner]

---

[5]Although the details are somewhat unclear, it appears that shortly after the murder, police officers obtained an arrest warrant for Petitioner and Walker and came to the home where they were staying, based on leads the police had obtained indicating that Walker had been identified at the scene of the crime and that Petitioner and Walker had been seen together shortly before the murder occurred, riding in a grey minivan that was left parked near the crime scene with its lights flashing.  Police returned to the home later with a search warrant, but obtained only some wet clothing that matched the description of the clothing Walker had been wearing on the night of the murder. They found no evidence to incriminate Petitioner.  (*See* Doc. 13-7 at 33-73; Doc. 13-14 at 151-54; Doc. 13-15 at 1).

23

> in court. Either way being tried with Mr. Walker denied [Petitioner] any opportunity to a fair trial.

(Doc. 13-7 at 108-09). The Supreme Court of Georgia construed this claim as alleging that "the trial court erred in denying [Petitioner's] motion to sever his trial from Walker's." *Charleston*, 743 S.E.2d at 4. The court rejected this claim

> for the same reasons that [it] held that the [trial] court did not abuse its discretion in denying Walker's motion to sever his trial from [Petitioner's]:
>
>> The case involved a straightforward chain of events occurring over a period of a few days culminating in the shooting of a single victim. The evidence adduced at trial was not complex. Both defendants were named in every count of the indictment, and their defenses were not antagonistic to each other.

*Id.* (citation omitted).

> Petitioner argues here, in his supporting brief:
>
> [His] trial counsel pointed out certain evidence that weighed heavily against defendant Scott Walker. All the evidence of identification went against [] Walker, who was positively identified by the State's key witness, Cheryll Sewell, as the perpetrator of the crime. The Petitioner had not been identified at all except in regard to matters not related to the crime itself. There was no evidence of intent on the Petitioner's part. Standing alone, the evidence against the Petitioner was not enough to go to a jury. There was no evidence of a conspiracy. None of the State's witnesses testified that they heard conversations between the Petitioner and his co-defendant saying they were going to harm the victim.

24

> As a result of the trial court's failure to sever the Petitioner's trial the Petitioner was convicted based on evidence that should have been attributed to Walker alone. Specifically, the Petitioner was prejudiced at trial when the State [implied] that both defendant[]s were acting in concert when Walker went to the victim's apartment on Tuesday, Wednesday, and Friday, looking for the victim. The State attributed Walker's actions to the Petitioner, saying "they" went to the victim's apartment saying, "I want the gun." (Resp. Ex. 7 (e), p. 1039).
>
> Walker was found hiding in a room under a bed in underwear. The State attributed his actions to the Petitioner saying, the Petitioner allowed him to hide in the basement. State argued the Petitioner tried to change his appearance by changing clothes. (Resp. Ex. 7 (e), p. 1041). The clothing found by police was identified as belonging to Walker (Resp. Ex. 7 (a), p. 47), but the State attributed the evidence to the Petitioner. The Petitioner was merely in the shadow of his co-defendant throughout the trial.

(Doc. 16 at 7-8).

A district court in this Circuit recently explained the controlling caselaw on this issue:

> The Supreme Court has recognized no general right to a separate criminal trial. *Zafiro v. United States*, 506 U.S. 534, 541 (1993). Following *Zafiro*, courts "have discretion to grant a severance if a defendant carries his burden to show both that (1) a joint trial would actually prejudice the defendant *and* (2) a severance is the proper remedy for the prejudice, rather than jury instructions or another remedy." *Puiatti v. McNeil*, 626 F.3d 1283, 1309 (11th Cir. 2010) (citing *Zafiro*, 506 U.S. at 539-41). As to the first *Zafiro* step, a defendant "must carry the heavy burden of demonstrating the lack of a fair trial due to actual, compelling prejudice." *Puiatti*, 626 F.3d at 1309. Mutually antagonistic defenses are not prejudicial *per se*. *Zafiro*, 506 U.S. at 538[;] . . . [*see id.* at 540 ("it is well

settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials")].  As to the second step, severance is not automatically required even if prejudice is shown. *Id.* at 539-40. Even where the risk of prejudice is high, a limiting instruction . . . "often will suffice to cure any risk of prejudice." *Id.* at 539. Trial courts [should] order severance only where there is a serious risk that a joint trial will "compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539. In sum, the decision whether to grant a motion for severance lies with the trial court's sound discretion. *Id.* at 538-39.

*Butler v. Brown*, CV 113-016, 2014 U.S. Dist. LEXIS 92917, at *26-27 (S.D. Ga. June 11) (citations and formatting altered) (internal quotations omitted or added), *adopted by* 2014 U.S. Dist. LEXIS 92492 (S.D. Ga. July 8, 2014).

Petitioner and Walker faced identical charges and did not present antagonistic defenses; and given the following facts — they both visited Lyman's apartment in the days leading up to the murder, seeking the return of a gun the victim had in his possession; they were seen together shortly before the shooting; they were identified at the scene; the vehicle Petitioner was driving that night was left parked at the apartment building where the shooting occurred; and they were found together a short time later at Petitioner's father's house, *see Charleston*, 743 S.E.2d at 3-4 — Petitioner has not shown that he was unfairly prejudiced by the evidence adduced against Walker or that the Supreme Court of Georgia's "ruling on . . . [his ground five claim regarding

26

severance] was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *see Richter*, 562 U.S. at 103.

### F.    Ground Six: Trial Court Error – New Evidence

In ground six, Petitioner asserts: "The trial court erred in not granting a new trial based on the spontaneous utterance of co-defendant Scott Walker, clearing [Petitioner]." (Doc. 1 at 11; *see* Doc. 13-7 at 109).  Petitioner argued on direct appeal:

> [C]o-defendant Scott Walker made a spontaneous utterance at sentencing [that] cleared [Petitioner]. Mr. Walker said that ***[Petitioner] did not do it, I did. [Petitioner] didn't know nothing were going to go down like that***. . . . If the Court finds Mr. Walker's utterance important enough to quote it in their denial of his appeal, that it some how spoke to the truth of the matter, shouldn't it still speak to the truth of the matter in the present appeal. That is if the Court is influenced by the utterance to believe Mr. Walker shot the victim, they should take the next logical step and accept that [Petitioner] had nothing to do with the shooting. Of course the state will put forth their belief that the evidence of the utterance should be ignored as it is not new evidence. This is of course incorrect. While [Petitioner] always maintained his innocence, Mr. Walker broke from his position and proclaimed his guilt by his statement. In this way it was new evidence. If [Petitioner] could not make Mr. Walker tell the truth what other alternative did he have? In essence he was fighting a co-defendant who would not volunteer the truth, a trial judge who would not sever him from the same, and a prosecutor who understands that it [is] easier to convict two than one. To deny this new evidence is to deny [Petitioner a] fair and impartial trial . . . .

(Doc. 13-7 at 109-10).  The Supreme Court of Georgia construed this claim as alleging

27

that "the trial court erred in failing to grant [Petitioner's] motion for new trial based on this allegedly 'newly discovered evidence.' " *Charleston*, 743 S.E.2d at 6. The court rejected this claim:

> To obtain a new trial based on newly discovered evidence, the defendant must meet six requirements, and the failure to satisfy even one means that the motion for new trial must be denied. *See Drane v. State*, 291 Ga. 298, 300 (728 SE2d 679) (2012). At a minimum, [Petitioner] failed to satisfy the requirement that " 'the affidavit of the witness [providing the allegedly new evidence] should be procured or its absence accounted for.' " *Id.* (citation omitted). Walker's statement at his sentencing was not sworn, and Appellant did not procure an affidavit from Walker, call him as a witness at the motion for new trial hearing, or account for the inability to provide the required sworn statement. *See Davis v. State*, 283 Ga. 438, 443 (660 SE2d 354) (2008) (holding that an unsworn affidavit submitted to support a motion for new trial based on newly discovered evidence must be disregarded). Appellant thus failed to satisfy at least this requirement for obtaining a new trial based on newly discovered evidence, and the trial court therefore properly denied his motion.

*Id.*

Petitioner argues here, in his supporting brief:

> Walker's declaration appeared on the face of the record. The trial court abused its discretion in refusing to make inquiry into new evidence of Walker's motive for the shooting and in denying Petitioner an opportunity to obtain testimony from Walker at earliest practical moment, which would have also afforded the State an opportunity to cross-examine. The trial court's action was contrary to the fundamental principles of due process.

(Doc. 16 at 8).

28

It is noteworthy in this regard that in rejecting Petitioner's claim of ineffective assistance of appellate counsel for failing to properly litigate Petitioner's claim regarding the newly discovered evidence of his innocence, the state habeas court stated: "[Walker's] testimony at Petitioner's September 19, 2014, habeas evidentiary hearing was extremely unfavorable to Petitioner, as [Walker] asserted he had only made such a statement at the sentencing hearing because Petitioner told him [it] would get them both a new trial."  (Doc. 13-4 at 13).  So much for Petitioner's claim that Walker's statement at sentencing is evidence of his actual innocence that warranted a new trial.  Petitioner, indeed, has not "show[n] that the [Supreme Court of Georgia's] ruling on . . . [his ground six claim] was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *See Richter*, 562 U.S. at 103.

## G.   Ground Seven:  Insufficiency of the Evidence

In ground seven, Petitioner alleges: "The evidence was insufficient as a matter of a law to sustain a verdict."  (Doc. 1 at 11; *see* Doc. 13-7 at 110).  On direct appeal, Petitioner argued:

> The evidence was insufficient to sustain a verdict. There were no security tapes secured from the complex. There were only two witnesses, Ms. Lyman and Ms. Sewell, who claimed to have seen anything.

29

> Ms. Lyman[] admittedly did not see the shooting. She heard the shot but when she came out of the bedroom the individuals who shot the victim were already gone. Ms. Sewell claimed to have seen Mr. Walker and another man run from the apartment. However, she did not know the other man's name nor was she able to pick [Petitioner] out of the police photo array. It wasn't until over a year later that she was able to pick [Petitioner] out in trial. A trial where he sat next to Mr. Walker. I [Petitioner's appellate counsel] wasn't even there and I could have picked him out.

(Doc. 13-7 at 110-11).  In fact, however, there was a third witness who identified Petitioner and Walker as the two individuals involved in the shooting, *see Charleston*, 743 S.E.2d at 3 (discussing testimony of Kahiem Maddox), as well as much additional evidence implicating Petitioner in his crimes of conviction, *see id.* at 3-4.

The Supreme Court of Georgia concluded that "the evidence presented at trial . . . was sufficient to authorize a rational jury to find [Petitioner] guilty beyond a reasonable doubt of [his] crimes of [conviction,]" noting that "[e]ven if [he] was not the shooter, his conduct with Walker before, during, and after the shooting supports his convictions as a party to the crimes."  *Id.* at 4 (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (evidence sufficient to convict beyond a reasonable doubt); OCGA § 16-2-20 ("When a person is a party to a crime")).

Petitioner argues here, in his supporting brief:

The State described its case to be about guns, home invasion, and the

30

tragic loss of life. The State's theory suggested that the Petitioner and his co-defendant shared common criminal intent to kill the victim who refused to return a handgun belonging to the Petitioner. The Petitioner was tried as a party to the crime but the State provided no evidence that the Petitioner conspired with his co-defendant to kill the victim. The State's motive theory was wholly unsupported. The State presented no evidence to show [] any prior difficulty between Petitioner and the victim. The State's witnesses described the Petitioner's relationship with the victim as friendly. The Petitioner said the victim could have the gun, and the victim's girlfriend described his mannerism as polite and non-threatening. (Resp. Ex. 7 (c), pp. 759-760). The victim's brother said the Petitioner and the victim were on friendly terms. Therefore, the State did not satisfy every element necessary to prove Petitioner was a party to the crime.

(Doc. 16 at 9). These arguments fail. The circumstantial evidence of Petitioner's guilt was overwhelming. Just as for grounds five and six, and for the reasons stated in the discussion of those grounds, Petitioner has not "show[n] that the [Supreme Court of Georgia's] ruling on . . . [his ground seven claim] was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *See Richter*, 562 U.S. at 103.

## H. Petitioner's Later-Filed Grounds Also Fail

In his first amended federal habeas petition, Petitioner raises six additional grounds for relief, numbered consecutively to his original seven grounds. The first five new grounds claim ineffective assistance of appellate counsel, alleging first that

31

appellate counsel provided ineffective assistance

8.      when litigating [Petitioner's] amended motion for new trial on the ground
        of newly discovered evidence;

and also alleging that appellate counsel provided ineffective assistance by failing to

raise the following claims in Petitioner's amended motion for new trial:

9.      that the trial Court failed to act as an impartial judicial sovereign when it
        prevented the Petitioner from obtaining and submitting newly discovered
        evidence that would negate his guilt of [his] offenses [of conviction];

10.     that trial counsel rendered ineffective assistance when she failed to file
        a pre-trial motion to suppress unreliable identification testimony of
        Cheryll Sewell (State's key witness) and prevent an in-court
        identification following an impermissibly suggestive pre-trial photo
        line-up identification procedure conducted by police;

11.     that trial counsel rendered ineffective assistance when she failed to move
        for a mistrial based on State's violation of due process;

12.     that trial counsel rendered ineffective assistance when she failed to object
        to the State's improper closing arguments that compromised the
        fundamental fairness of trial.

(Doc. 12 at 7-15; *see* Doc. 16 at 9-20).  Petitioner also claims:

13.     [He] is actually innocent of the offenses [of] which he has been convicted
        and [for which he] is currently being held [by] the Georgia Department
        of Corrections serving a life sentence. (This is not a freestanding claim.
        [His] claim of actual innocence is premised on the aforementioned claims
        of this Petition.).

(Doc. 12 at 15; Doc. 16 at 20).  These are six of the seven claims that Petitioner raised

32

in his state habeas petition, as first amended.  (*See* Docs. 13-1, 13-2).

All of these claims are either time-barred or without merit.  The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires that an application for federal habeas review of a state court judgment of conviction be filed within one year of the latest of the following dates:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).  And "the federal statute of limitations requires a claim-by-claim approach to determine [the] timeliness" of 28 U.S.C. § 2254 claims. *Zack v. Tucker*, 704 F.3d 917, 918 (11th Cir. 2013) (*en banc*).

If the record does not suggest otherwise, and here it does not, the limitations

33

period for a federal habeas petition is triggered by the finality of the judgment of conviction at issue, i.e., "by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). Because Petitioner received direct review of his judgment of conviction in the Supreme Court of Georgia, but he did not seek direct review in the Supreme Court of the United States within the 90-day time limit for doing so, his convictions became final under § 2244(d)(1)(A) at the close of that 90-day window. *See* SUP. CT. R. 13.1 (allowing 90 days to file certiorari petition in Supreme Court of the United States seeking review of "a judgment . . . entered by a state court of last resort"); *Bond v. Moore*, 309 F.3d 770, 774 (11th Cir. 2002) (holding that "statute of limitations under 28 U.S.C. § 2244(d) should not . . . beg[i]n to run until this 90-day window ha[s] expired").

The Supreme Court of Georgia affirmed Petitioner's judgment of conviction on March 25, 2013. The period for Petitioner to seek review in the Supreme Court of the United States ended on June 24, 2013, the first business day after the expiration of the 90-day window for seeking that review. On that date, Petitioner's judgment of conviction became final for purposes of the federal habeas statute of limitations. He filed his state habeas petition (Doc. 13-1) 239 days later, on February 18, 2014. The federal limitations period was then tolled until the Supreme Court of Georgia denied

34

his CPC application on May 11, 2015 (Doc. 13-5), at which point it began to run again. *See* 28 U.S.C. § 2244(d)(2) (statutory tolling applies when "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending"); *but see Smallwood v. Sec'y, Dep't of Corr.*, 178 Fed. Appx. 944, 945 (11th Cir. 2006) (citing *Duncan v. Walker*, 533 U.S. 167, 181 (2001), to the effect that a previously filed federal habeas petition — here, Petitioner's original, unamended petition — does *not* toll the federal limitations period).

Petitioner first raised grounds eight through thirteen here on October 26, 2015 (Doc. 12), after another 167 days had passed untolled since May 11, 2015, for a total of 406 days.  By that time, the 365-day federal limitations period had expired for grounds eight through thirteen.

Federal Rule of Procedure 15(c)(1)(B) provides, however, that "[a]n amendment to a pleading relates back to the date of the original pleading when the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out–or attempted to be set out–in the original pleading" (formatting altered); *see Smith v. Buss*, No. 3:09cv278/MCR/EMT, 2011 U.S. Dist. LEXIS 19637, at *18-19 (N.D. Fla. Feb. 4) ("[R]elation back is allowable only 'when the claims added by amendment arise from the same core facts as the timely filed claims, and not when the new claims

35

depend upon events separate in "both time and type" from the originally raised episodes.' " (citing *Mayle v. Felix*, 545 U.S. 644, 653-54, 657, 664 (2005), to the effect that "the test for whether an amended petition relates back [is] whether the original and amended claims 'are tied to a common core of operative facts.' " (footnote omitted))), *adopted by* 2011 U.S. Dist. LEXIS 19293 (N.D. Fla. Feb. 25, 2011).

The Eleventh Circuit has explained the application of the relation back rule as follows:

> In *Mayle*, the defendant-appellant timely alleged that his conviction violated the Fifth Amendment because videotaped statements of a witness were played for the jury in violation of his right to confront the witness. However, five months after the one-year limitation imposed under the AEDPA expired, he moved to amend his petition to add another claim regarding his pretrial statements to the police. The magistrate judge denied the amendment, reasoning the claim did not relate back:
>
> > [The defendant's] allegedly involuntary statements to police did not arise out of the same conduct, transaction, or occurrence as the videotaped interrogation of prosecution witness Kenneth Williams.
>
> The magistrate judge also found that it did not suffice that [the Defendant's] Fifth and Sixth Amendment claims attack the same criminal conviction. The district court then adopted the magistrate judge's recommendation for dismissal of the defendant's claim. On appeal, however, the Ninth Circuit reversed the district court, finding that the defendant's "trial and conviction in state court" constituted a "transaction" within the meaning of Rule 15(c)(2).

36

The Supreme Court reversed the Ninth Circuit. In reaching its holding, the Court stressed that . . . the key words [in the relation back provision] are conduct, transaction, or occurrence. The Court further reasoned:

> Habeas Corpus Rule 2(c) . . . instructs petitioners to specify all available grounds for relief and to state the facts supporting each ground. Under that rule, [the defendant's] Confrontation Clause claim would be pleaded discretely, as would his self-incrimination claim. Each separate congeries of facts supporting the grounds for relief, the Rule suggests, would delineate an "occurrence." [The defendant's] approach, the approach that prevailed in the Ninth Circuit, is boundless by comparison. A miscellany of claims for relief could be raised later rather than sooner and relate back, for "conduct, transaction, or occurrence" would be defined to encompass any pretrial, trial, or post-trial error that could provide a basis for challenging the conviction. An approach of that breadth . . . views "occurrence" at too high a level of generality.

Relation back, the Court explained, is only allowable when the claims added by amendment arise from the same core facts as the timely filed claims, and not when the new claims depend upon events separate in both time and type from the originally raised episodes.

*McLean v. United States*, No. 04-13534, 2005 U.S. App. LEXIS 19546, at *2-5 (11th Cir. Sept. 8, 2005) (citations and internal quotation marks omitted).

In his original habeas petition, in grounds one through seven, Petitioner raises claims regarding the testimony of Jonathan Finney and Pamela Lyman, the search of his father's home, the sufficiency of the evidence, and the trial court's failure to sever

37

his trial from his co-defendant's and its failure to grant his motion for new trial based on his co-defendant's "confession" at the sentencing hearing.  In grounds ten through twelve, Petitioner raises claims regarding a witness's identification of him and the alleged due process violations involving that identification (*see* Doc. 13-4 at 7), as well as the alleged prejudicial effect of the prosecutor's closing argument.  It is apparent that these grounds do not relate back because none involves the same operative facts as any of Petitioner's timely claims.  The Court need not address these grounds on the merits.

In grounds eight, nine, and thirteen, Petitioner raises claims regarding his alleged actual innocence, including the failure of his motion for new trial.  Although these grounds arguably relate back to Petitioner's ground six claim regarding the denial of his motion for new trial, they fail for the same reason that ground six fails — Petitioner has never presented any evidence of his actual innocence.  Indeed, the slender reed upon which all these claims rely collapsed completely during Petitioner's state habeas proceedings, when his co-defendant testified that he only confessed and removed the blame from Petitioner because Petitioner had asked him to do so in order for both of them to receive a new trial.  (*See* Doc. 13-4 at 17).  These remaining grounds fail for the same reasons that Petitioner's ground six claim fails.

## IV.   Certificate Of Appealability

A state prisoner must obtain a certificate of appealability (COA) before appealing the denial of his federal habeas petition.  28 U.S.C. § 2253(c)(1)(A).  A COA may issue only when the petitioner makes a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This standard is met when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quotations omitted).  A petitioner need not "show he will ultimately succeed on appeal" because "[t]he question is the debatability of the underlying constitutional claim, not the resolution of that debate."  *Lamarca v. Sec'y, Dep't of Corr.*, 568 F.3d 929, 934 (11th Cir. 2009) (citing *Miller-El v. Cockrell*, 537 U.S. 322, 337, 342 (2003)).  Because there is no reasonable argument to support a finding that Petitioner has presented a timely claim of sufficient merit to warrant federal habeas relief, a certificate of appealability is not warranted in this case.

## V.   Conclusion

For the foregoing reasons, **IT IS RECOMMENDED** that the Court **DENY** the petition for a writ of habeas corpus, as amended (Docs. 1, 12, 16), **DISMISS** this

39

action, and **DENY** Petitioner a certificate of appealability.  Petitioner's motion for appointment of counsel (Doc. 25) is **DENIED**.

The Clerk is **DIRECTED** to terminate the referral to the Magistrate Judge.

**SO RECOMMENDED** this 23rd day of May, 2016.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE

40